UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LEVENTE NAGY,

Plaintiff,

v. 19 Civ. 6395 (PGG)

MHP LAND ASSOCIATES, LLC., MASTIC ASSOCIATES OF NEW YORK, LLC., and OGDEN CAP PROPERTIES, LLC.,

Defendants. Conference

------------------------------x

New York, N.Y.
October 26, 2022
2:15 p.m.

Before:

HON. PAUL G. GARDEPHE,

District Judge

APPEARANCES

RONAI & RONAI, LLP
Attorney for Plaintiff
BY: JOHN F. DELLA JACONO

LONDON FISCHER, LLP
Attorney for Defendants
BY: ANTHONY F. TAGLIAGAMBE
ROBERT ROTHMAN

(Case called)

MR. JACONO: Good afternoon.

John Della Jacono from Ronai & Ronai for the plaintiff.

MR. TAGLIAGAMBE: Good afternoon.

Anthony Tagliagambe on behalf of the defendants from London Fischer.

MR. ROTHMAN: Good afternoon, your Honor.

Robert Rothman from London Fischer on behalf of the defendants.

THE COURT: All right. This matter is scheduled for a jury trial on Monday, October 31. The matter is on my calendar for a final pretrial conference. The plaintiff is a man named Levente Nagy, L-E-V-E-N-T-E. Defendants are MHP Land Associates, LLC., Mastic Associates of New York, LLC., and Ogden CAP Properties, LLC. The lawsuit arises from an incident on January 23, 2019. Plaintiff was working at a building called Windsor Court, which is located at 155 East 31st Street in Manhattan. Defendants, MHP Land Associates and Mastic Associates, own Windsor Court; and defendant, Ogden Properties, manages Windsor Court on behalf of the owners. Citing the joint pretrial order, Docket No. 87 at page 5.

On January 3, 2019, plaintiff, who was employed by Spring Scaffold, LLC. was working on a scaffold at Windsor Court. The scaffold was located about 12 feet off the ground.

According to plaintiff, that afternoon, he climbed down a scaffolding in order to use a restroom. One of the scaffold beams on which plaintiff placed his foot shifted, causing plaintiff to fall to the sidewalk and to suffer a serious back injury resulting in a cervical fusion and lumbar fusion. Plaintiff alleges that there was no ladder readily available for him to use and, accordingly, defendants are liable for damages under New York Labor Law Sections 240, 241, and 200. *Id.* At pages 2 to 3. I note that all of plaintiff's claims here are statutory. There is no claim for common law negligence.

Defendants contend that plaintiff was instructed to use a ladder when climbing down from a scaffold and that a ladder was available at the time of his fall. Defendants further contend that plaintiff suffered only minor injuries at the time of his fall, and that the back surgery that he underwent was not the result of the injuries he sustained on January 23, 2019. *Id.* At page 3 to 4. The parties have filed motions *in limine*, which I will address now.

Plaintiff has moved *in limine* to exclude testimony from defense witnesses Dr. Jeffrey Spivak, S-P-I-V-A-K, and Dr. Jonathan S. Luchs, L-U-C-H-S, on the grounds that expert disclosure under Federal Rules of Civil Procedure 26(a)(2) wasn't proper, citing Docket No. 89.

My law clerk has informed me that plaintiff is

withdrawing that motion; is that correct?

MR. JACONO: That's correct, your Honor.

THE COURT: All right. Then I will move to the next motion.

Plaintiff has also moved to exclude a Social Security card that defendants wish to introduce at trial. *Id.* *See Also* Docket No. 90-3.

Defendants have submitted a photocopy of what appears to be a Social Security card in the name of Levente Nagy. It bears such Security No. 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.

In the joint pretrial order, plaintiff states that he "is a citizen of Hungary who is not permitted for permanent residence in the United States." Citing the joint pretrial order, Docket No. 87-2.

I understand that defendants wish to introduce the -- well, I was about to say that defendants wish to introduce the Social Security card to demonstrate that there should be a limitation on future wage damages given that Mr. Nagy is not a citizen of the United States. But given plaintiff's statement in the joint pretrial order that he is a citizen of Hungary who had no residency status in the United States, I'm not sure I understand what the relevance of the Social Security card is.

So perhaps defendants could tell me why they feel the Social Security card is relevant here in light of plaintiff's statement that he's a citizen of Hungary and had no residency

status in the United States.

MR. TAGLIAGAMBE: Your Honor, addressing that issue, I represent on a good faith basis that, notwithstanding that plaintiff appeared to have a Social Security card when he applied for employment with Spring Scaffolding at his deposition, he admitted that he had neither a green card at that time nor a Social Security number. I think it's important with respect to the credibility evaluation that the jury must make regarding the totality of plaintiff's testimony. And should they consider that he did not testify honestly with respect to the Social Security issue, it could impact the way they evaluate and weigh --

THE COURT: I'm sorry. I thought you just said that he admitted he didn't have a green card. I thought you said he admitted he didn't have a Social Security card either.

Did I miss hear you?

MR. TAGLIAGAMBE: No.

THE COURT: So he admitted at the deposition he doesn't have a green card, and he admitted he doesn't have a Social Security card, but you elicited from him that he, none the less, has a Social Security card. So what I take away from that is that you believe that the Social Security card is forged.

MR. TAGLIAGAMBE: Your Honor, that's a potential issue in the case. And if that is correct, it has other implications

concerning the wage claim. And certainly, it's a credibility issue at a minimum.

THE COURT: So in the first instance you say it's a credibility issue because he presented -- I take it that your argument is that he presented to his-employer——who is not a party in this case——a false or invalid Social Security card?

MR. TAGLIAGAMBE: Correct, your Honor.

THE COURT: Okay. And then I think you just said that you also believe that the false or invalid Social Security card also has implications for his wage claim.

MR. TAGLIAGAMBE: Yes, your Honor.

THE COURT: Could you talk about that also?

MR. TAGLIAGAMBE: Yes, your Honor.

The plaintiff's economist renders opinions with respect to future loss of earnings. However, under the Illegal Immigration Reform and Immigrant Responsibility Act, the federal rule that is in effect says if someone is not lawfully in the United States, that becomes a prohibition with respect to earning. And I think it goes to the credibility——at a minimum——of the expert's opinions, whether she considered job availability and all the benefits that she also references in her report, whether they would be properly available to the plaintiff. So I think there's an important --

THE COURT: You can cross-examine her about whether she considered the fact that the plaintiff is a citizen of a

foreign country and does not have residency status in the United States. You can do that because -- and I haven't studied her report, but I understand from the briefing that her report does not take into account the fact that the plaintiff is a citizen of a foreign country and does not have residency status in the United States.

But what I'm having trouble with is the connection between that and the Social Security card, given plaintiff's apparent stipulation that he is a citizen of Hungary and does not have residency status here.

MR. TAGLIAGAMBE: Your Honor, the argument, if it's permissible in front of the jury, would be that if he presented -- I'm using the word and I'm trying to be careful, but using the word "false documentation," that goes to the credibility of whether -- if someone is willing to --

THE COURT: No. I understand how it goes to his credibility, the plaintiff's credibility.

MR. TAGLIAGAMBE: Yes, your Honor.

THE COURT: I understand your argument on that point.

What we're talking about now——because you introduced the idea——is how the Social Security card is relevant to the plaintiff's expert on economic damages. That's what I'm struggling with.

MR. TAGLIAGAMBE: Your Honor, it's just a foundation to establish that he may not be a lawful citizen.

THE COURT: But again, there's an apparent stipulation to that, right?

MR. TAGLIAGAMBE: Yes.

THE COURT: Let me just make sure there's no confusion on this. So let me ask plaintiff's counsel:

Are you prepared to stipulate, as you said in the joint pretrial order, that your client is a citizen of Hungary who doesn't have residency status in the United States?

MR. JACONO: Yes, your Honor.

THE COURT: Okay. So there's a stipulation on that. I will assume that that stipulation will be added to the stipulations that the parties have already agreed to.

So you will be allowed to cross-examine the plaintiff's economic damages expert on the question of did she take into account the fact that the plaintiff is a citizen of Hungary and does not have residency status in the United States.

MR. TAGLIAGAMBE: Thank you, your Honor.

THE COURT: So we're back to the Social Security card. And I think what your argument really is is it goes to his credibility.

MR. TAGLIAGAMBE: Yes, your Honor.

THE COURT: Okay. And you also have a subsidiary argument that if he presented false documents to his employer it could actually be a bar to him recovering damages, right?

MR. TAGLIAGAMBE: Yes, your Honor.

THE COURT: Now, on that subject, as I'm sure counsel are aware, there is a Second Circuit decision that is on point, and that case is *Madeira*, M-A-D-E-I-R-A, v. *Affordable Housing Foundation, Inc.*, 469 F.3d 219 2006. As I said, it's a Second Circuit decision.

The Second Circuit case deals with the same statute that is at issue here, which is essentially one that provides for absolute liability in circumstances where a contractor does not provide appropriate equipment——in this case, a ladder, allegedly——and the issue in *Madeira* was whether the fact that the plaintiff was an illegal alien, whether that operated as a bar to him seeking damages for future wages. And the argument was that if he were permitted to obtain damages for future lost earnings, that that would undermine federal immigration law.

The Second Circuit, in a lengthy opinion, analyzes a whole series of legal issues arising from the interplay between Federal Immigration Law and New York Labor Law. Those issues include whether the Federal Immigration Law preempts New York State Law allowing undocumented workers injured in construction accidents to recover compensatory damages for lost United States earnings. And the case also addresses this issue that counsel just alluded to where a worker has presented false documents to his employer. That conduct could act as a bar for his recovery of damages under certain circumstances. One of

those circumstances is whether the employer satisfied its obligations with respect to determining plaintiff's status in this country.

In order to determine, in this case, how Federal Immigration Law interacts with the New York Labor Law, I would need not only the evidence regarding the Social Security card that defendant wants to offer showing presumably that plaintiff submitted an invalid Social Security card to his employer, I would also need evidence on whether the employer satisfied its responsibilities under the federal immigration statute which involves confirming the status that the employee represented.

So the reason why I'm going into this level of detail is this is a very complex issue which has not been briefed by the parties and which requires careful thought. The *Madeira* case is helpful, but the facts here may be different. And so I am going to need a briefing on this subject.

But before I go further, let me hear from plaintiff's counsel as to what their position is on the Social Security card, including whether Mr. Nagy did, in fact, submit the Social Security card that has been provided to the Court by defense counsel.

MR. JACONO: Mr. Nagy did not submit that Social Security card. That Social Security card is not authenticated in any way, shape, or form. It's not signed by anybody. It has a date on the bottom of it of 2016. Mr. Nagy has testified

under oath at the deposition that he did not enter this country until 2018. So it's going to be our position——and I've spoken to Mr. Nagy——that that was not his Social Security card. It was never presented. He doesn't know why it was presented. He doesn't know that number. And that's going to be the testimony.

MR. TAGLIAGAMBE: Your Honor, just a brief response.

The I-9 document, which is signed off by Mr. Nagy upon information and belief and which we've subpoenaed, has a Social Security number on it. So presumably, the information was provided by Mr. Nagy, we could have testimony with regard to that. To confirm testimony, we've served a subpoena to have Mr. Nagy's passport brought to this courtroom and, presumably, that will confirm one way or the other the actual date of emigration to the United States.

And I respect your Honor's statements that this is a somewhat complicated issue. We want to ensure your Honor that whatever is presented to the jury is proper. We don't want to run the risk of a mistrial. So I mention that because we do think there is a good faith position that we have concerning potential false documentation presumably from Mr. Nagy, and whatever implication may arise from that. So that's why we're trying to tread carefully with respect to how we present anything to the jury. We appreciate your Honor's ruling that we may cross-examine plaintiff's economist with regard to this

issue. So we will be guided accordingly by your Honor's directives.

THE COURT: All right. Well, my first piece of advice would be to carefully read this *Madeira* decision. Because, as I said, in order for the plaintiff's immigration status to act as any sort of bar on the recovery of damages, there would have to be evidence that the plaintiff submitted false documentation to his employer concerning his legal status and, as I said, evidence that the employer did what it was supposed to do under the law in terms of confirming the plaintiff's status.

Based on that what I've heard from plaintiff's counsel already, it's clear to me that there are going to be fact issues. But as counsel has represented that his client will testify that he had nothing to do with that Social Security card and has no association with that Social Security number, defense counsel has represented that there is an immigration document that Mr. Nagy completed at the time he entered the country which reflects a Social Security number. But I gather the same number that's on the invalid Social Security card that has been submitted.

So while I was hopeful I could resolve this issue prior to trial, it appears to me——just from what I've heard so far and what I've read——that there are likely going to be fact issues that are going to have to be presented to the jury. But as I will address in a moment, I am going to need briefing from

the parties as to the interplay between Federal Immigration Law and New York Labor Law, specifically the statutes at issue in this case, and whether the circumstances here are such that Federal Immigration Law would prohibit a damage award for lost earnings because of the plaintiff's status.

So because we have a trial scheduled for Monday, I'm going to set a short deadline for that, but I'll address that in a moment.

MR. JACONO: Your Honor?

THE COURT: Yes.

MR. JACONO: You said there was a two-prong approach to this; one, that the employer did what he was supposed to do to verify. There will be no testimony about that at all at this trial because the only person that could possibly testify to that is the foreman. And the foreman does not have any knowledge, according to his deposition, when he was asked questions not specifically about this but about employees, their status, their wages or anything to that effect.

So if both prongs are not met——and I'm assuming that's what we're talking about here——how does the Social Security card or that issue become a fact issue for the jury when we haven't even reached the second prong? And the reason I say this is because there's no one else on the list from the employer to testify about any of this. So all of the facts will never be brought to the jury based on what your Honor has

just told us here today.

THE COURT: Does defense counsel agree with that statement?

MR. TAGLIAGAMBE: Your Honor, I would have to verify, subject to verification, that the foreman who testified and was in effect plaintiff's boss on the job would have information regarding the paperwork, the application process, et cetera, that would be involved. I would verify that, but my sense is he that probably does not have that information, your Honor. It would have to come from someone at the company that employed Mr. Nagy.

THE COURT: All right. You'll see that the *Madeira* case involved circumstances in which the Court concluded that the employer had been at fault and, as a result, the Court found that the damages were properly awarded. But this is a very, very lengthy decision. I just printed it out before I came down here. It's 28 pages. It's quite complex. I think the test that I've been talking about is a four-factor test.

Suffice it to say, I'm going to give counsel an opportunity to brief the application to this case and any other law that they consider relevant. With respect to this specific issue, obviously I'm going to want counsel to address whether there is going to be evidence that puts into dispute the four factors that are discussed in the *Madeira* case. And if not, maybe it will be possible for me to make some sort of pretrial

ruling. But at this point, I haven't received any briefing on the subject and it's not appropriate for me to say any more.

MR. JACONO: Thank you.

THE COURT: There are some issues related to the Social Security card which I'm going to address.

Defendants have served a request to admit on plaintiff, asking him to admit that the Social Security card and number that I referenced a moment ago is not a valid Social Security card and number. It doesn't sound like there's going to be any factual dispute about that. Maybe the parties can work out a stipulation. But the point is, the request for admission was served on September 27, 2022, citing Docket No. 96 at page 8. As I understand it, plaintiff has not responded to the request for admission, citing defendant's opposition Docket No. 96 at page 9.

MR. TAGLIAGAMBE: Your Honor.

THE COURT: Yes?

MR. TAGLIAGAMBE: There was a response to the request for admissions.

THE COURT: Okay. I don't have that.

Can someone tell me what it says?

MR. JACONO: I don't have it in front of me.

MR. ROTHMAN: Your Honor, the response to request for admission stated they denied that it was plaintiff's Social Security card, and they admitted that the number that appears

on the Social Security card is not one that has been issued by the United States Government.

THE COURT: Okay. So the request to admit is no longer an issue.

Counsel just alluded to authentication, so let me address that for a minute.

The plaintiff has objected to the Social Security card on authentication grounds and I don't see any authentication issue here because, actually, defendant's argument is that the Social Security card is not authentic. Their argument is that it's invalid, that it's forged, fraudulent. In any event, they're not arguing that it's authentic; quite the opposite, they're arguing that it's unauthentic. Given what plaintiff's counsel has said today as well as what plaintiff testified to in his deposition, that he doesn't have a Social Security card——citing to plaintiff's deposition Docket No. 90-4 at page 26——plaintiff was never in any position to say that it was his Social Security card. So I don't see any authentication issue.

There are fact issues about whether he ever used the card. Defense counsel is free to cross-examine the plaintiff about the card. But in order for the card to be admitted, it seems to me somebody would have to link plaintiff to the card. And what I mean by "link," someone would have to testify that Mr. Nagy presented that Social Security card to his employer.

Is there going to be testimony on that point?

MR. TAGLIAGAMBE: Your Honor, I would have to speak to the plaintiff's foreman who testified at a deposition if he had any interaction with the process in which any documents were presented at the time of the application. I can provide that information certainly by Monday. Obviously if Mr. Ionascu——the individual who testified as the foreman——does not have that knowledge, I will advise plaintiff's counsel as well as the Court as soon as I can find out one way or the other.

THE COURT: Okay. So to be clear, I would certainly allow defense counsel to cross-examine Mr. Nagy about the card. If Mr. Nagy testifies in a manner that plaintiff's counsel says he will, which is that he doesn't recognize the card, he had nothing do with the card being issued, and that Social Security number has no relationship with him, then I don't see any basis for admitting the card at that point. I would need more foundation. And I've suggested that one possibility as to foundation would be calling someone from the employer who could testify that Mr. Nagy provided that Social Security card when he was hired.

But suffice it to say, at this point I would not admit the card without that sort of foundation. I would permit cross-examination; I think it gives defense counsel a good faith basis to ask questions that are pointed. But without more foundation, I don't believe the card is admissible.

MR. TAGLIAGAMBE: Your Honor, just for clarification

purposes, because, again, I want to make sure we don't do anything improper certainly in front of the jury, if we can identify someone from the employer who can say this was presented at the time of the application for the job position, can we identify that person obviously to the Court and plaintiff's counsel? And would that person be permitted to testify on that very limited narrow issue?

MR. JACONO: I would obviously object to that at this late stage. Even because the Social Security card was just turned over at this particular time, I think it changes not only the complexion of the case but it also is highly prejudicial at this point in time.

THE COURT: Okay. So let me come back to that, issue because a part of the basis on which plaintiff has objected to the Social Security card is that it was not produced in discovery, citing Docket No. 89 at page 21.

So defense counsel has responded that defendants "did not come into possession, custody, or control of a copy of plaintiff's Social Security card until September 21, 2022. Defendant subsequently in a timely manner served a request for admission upon plaintiff regarding plaintiff's Social Security card on September 27, 2022." Citing Docket No. 96 at page 8.

And I'll state for the record that attached as an exhibit to the request for admission was a copy of the Social Security card that I have described.

Now, because there is a dispute about whether the defendants timely provided the Social Security card to plaintiff's counsel, I will need a declaration from someone with personal knowledge setting forth the circumstances of how defendants came into possession of the alleged Social Security card. That declaration is to include information concerning who provided the card to defendants and when, and who provided defense counsel with the Social Security card and when, and all of the circumstances concerning the providing of the Social Security card. I can't address whether there's good cause for the late disclosure of the Social Security card until I have a declaration or affidavit setting forth the circumstances under which the Social Security card came into defense counsel's possession.

Plaintiff is arguing that, essentially, defendants sat on the Social Security card for some time and violated their obligations to supplement their discovery by turning over the card. Defendants tell me that they only came into possession of the card in late September, but I can't rely on statements in a brief for that purpose. I need an affidavit or declaration laying out the circumstances. And once I have that, I can make a ruling on whether there's good cause to allow the late submission of the Social Security card. But at this point, I'm not in a position to rule on that.

So we've talked a little bit about the *Madeira* case

and the legal issues that flow from it, and I am going to need, as I've said, additional briefing on that subject. To say additional briefing is a misnomer because there hasn't been any briefing on it. It's a complicated issue. We're going to trial on Monday and I'm going need additional briefing quickly. So the parties will submit supplemental letters on this issue flowing from *Madeira* and any related authority by 5 o'clock tomorrow. Because defendants are the proponent of this argument, they of course bear the burden of demonstrating that the law permits them to argue that plaintiff's immigration status should be considered by the jury in mitigation.

Let me address the related issue that we've already touched on regarding plaintiff's economic expert whose name is Kristin, K-R-I-S-T-I-N, Kucsma, K-U-C-S-M-A. Defendants had moved to preclude her testimony on two grounds; first, she factors in as future damages fringe benefits and health insurance that plaintiff was not receiving at the time of his injury; and second, defendants complain that she has not considered the fact that plaintiff had no valid Social Security card and therefore could not lawfully work in the United States, citing Docket No. 91, pages 3-4. I've discussed the latter issue to some extent, but let me comment on it in terms of how I regard her report.

It is true that the expert does not factor in whether plaintiff can validly work in the United States, can lawfully

work in the United States. She doesn't consider that as a factor here. The complexity of the legal issues associated with whether someone who is an illegal alien can recover under these New York statutes are such that it's hard for me to criticize her for not considering that issue in her report even at this moment, just a few days before trial, I have no clarity on the issue of whether the immigration laws act as a bar to plaintiff's recovery of future wages. And in fact, I've just asked the parties to brief the issue, which they have not done up to this point. So it's very difficult criticize the economic expert for not addressing a legal issue that wasn't briefed by the parties and has not yet been resolved by the Court. So I regard her failure to address plaintiff's legal status as another ground for cross-examination. But at this point, I don't believe it would justify my excluding her report.

As to the fringe benefit and health insurance issue, while I believe that this likewise presents an appropriate ground for cross-examination, I don't believe that it justifies excluding her testimony. Defendants concede that Ms. Kucsma is qualified to testify as to plaintiff's loss of future wages and that her report "incorporates reputable data," citing Docket No. 91 at page 5. To the extent she includes as damages fringe benefits and health insurance that plaintiff was not receiving at the time of his injury, defendant is of course welcome to

cross-examine her on this point and to argue to the jury that there is no basis for a future wage award that includes fringe benefits and health insurance that the plaintiff had not received at the time of his injury and——defendants may argue——would never have received. But I don't see either argument as a basis to exclude her testimony.

There's also an issue about late production of surveillance video. Plaintiff has moved to exclude a surveillance video of plaintiff that was shot in September 2021 arguing that defendants should have produced the video to plaintiff long ago, citing Docket No. 100. Defense counsel represents in a brief——citing Docket No. 104——that the surveillance video was obtained by defense counsel from counsel for plaintiff's employer Spring Scaffolding, LLC. on October 3, 2022, that he transmitted the video by overnight mail to plaintiff's counsel the next day, and that plaintiff's counsel in fact received a video the next day. *Id.*

As I've indicated, factual allegations made in a brief are of new use to me. Defense counsel will submit an affidavit or declaration from someone with personal knowledge laying out all the circumstances of how the video came into defense counsel's possession. That affidavit or declaration will likewise be submitted by 5 pm. tomorrow.

Assuming that defense counsel's affidavit or declaration provides a satisfactory explanation for why the

video was not produced earlier, I would not be inclined to exclude it. The video was not taken by an investigator working for defense counsel. Instead, as I understand it, the video was arranged for and obtained by a third party, plaintiff's employer, Spring Scaffolding. To the extent that plaintiff complains that outtakes and related materials were not provided, defense counsel has represented and will address in his affidavit or declaration that all video defense counsel obtained was made available by defense counsel to plaintiff. Defense counsel has also represented that, as I said, he provided the video to defense counsel as soon as he came into possession of it, citing Docket No. 104.

So all of the factual assertions that are made in Docket No. 104 will have to be essentially confirmed or verified in the form of a declaration or affidavit. But assuming the declaration or affidavit tracks the factual representations in defendant's brief, at this point, I don't see a basis to exclude it.

I would also note that plaintiff has not explained how he would suffer unfair prejudice from the admission of the video surveillance. Accordingly, it appears likely to me that the video will be admitted.

Before I came down to court today, I was handed a letter from plaintiff's counsel in which plaintiff moves to quash the subpoena served by defense counsel. Plaintiff's

counsel represents that the subpoena was served on him yesterday, October 25, 2022. I'm citing Docket No. 27 at page 1. The subpoena——and defense counsel alluded to it——seeks a copy of the plaintiff's permanent residence card, also known as a green card, as well as a copy of plaintiff's passport. I think plaintiff's counsel has represented today that plaintiff does not have a green card; is that correct?

MR. JACONO: My understanding is he does not have a green card.

THE COURT: Okay. In any event, I am going to grant the motion to quash. Discovery in the case has long since closed. Defendant has known since plaintiff's deposition in September 2020——two years ago——that plaintiff has no green card and is a citizen of Hungary. Defendants have not explained why they're serving a Rule 45 subpoena three business days before trial, and they have offered no argument suggesting that this type of subpoena is appropriate at this late date. Accordingly, the motion to quash is granted.

Are there other matters that counsel would like to raise at this point?

MR. JACONO: The only other thing——and counsel and I were going to talk about it——is that he has a witness who is going to testify about prior conduct of men on the ladder and working. She's not a member of Spring Scaffold. And her testimony——I can go through all of it now but I don't know if

it's appropriate now or if we should do it before the witness is about to testify, because I was going to ask for an offer of proof anyway——she can't remember whether she was there on the day of this accident. She cannot remember if these men worked for Spring Scaffold. She just came back from maternity leave at the time that the accident had happened. I'm sorry if I'm repeating myself, but she was not there on the day of the accident. And all of her testimony is based on the video that was provided to the Court that's going to be played to the jury.

I believe that the jury should be the determining factor as the trier of fact as to what they see on the video, not what someone's interpreting it, especially since she's not an expert and she just worked for some management company. That was the only other thing, your Honor, that I wanted to bring up.

THE COURT: What is the name of the witness?

MR. JACONO: Holly --

MR. ROTHMAN: Winecoff, your Honor.

THE COURT: Holly Winecoff?

MR. ROTHMAN: Yes.

THE COURT: That's spelled, W-I-N-E-C-O-F-F.

She is listed in the joint pretrial order as someone who is expected to testify "regarding the manner in which she observed workers to send the sidewalk shed as well as the

presence of ladders on the job cite."

So defense counsel just represented that she wasn't there on the day of the incident. So let me inquire of plaintiff's counsel.

Is this someone who was commonly on the work site at or about the time the jury was sustained?

MR. JACONO: Do you mean defense counsel? I made an argument.

THE COURT: I'm going to ask you. I'm directing the question to you.

MR. JACONO: To me.

Was she regularly on the job site?

THE COURT: Yes.

MR. JACONO: She said that she was there at certain times during the day on the job site but she can't remember whether she was there on this particular day, that was her testimony.

THE COURT: So my question is, understanding that she can't tell us whether she was there on January 23, was she commonly on the job site in and around January 23, 2019?

MR. JACONO: I would have to say that she was there on the job site at given times. Was she there every day? That, I can't comment on because I didn't do the deposition of her, your Honor. But based on what I've read, she did not say she was there all the time. And she had just come back from

maternity leave and she wasn't sure about the contracts, she wasn't sure who was working there, and she wasn't sure that the plaintiff's employer——she did testify at some point——whether they were actually the people that were putting up the scaffold and the shed.

THE COURT: All right. What I'm trying to understand is -- both sides apparently agree that she doesn't recall whether she was there on January 23. What I'm trying to get a sense of is, understanding that she doesn't remember whether she was there on January 23, was she commonly on the site in and around January 23, 2019? Because if the last time she was on the work site was sometime in 2018, there's no possibility she has anything useful to say.

So can someone help me with whether she was on the job site in some proximity to January 23, 2019?

MR. TAGLIAGAMBE: Your Honor, just as a foundation, the plaintiff testified at his deposition that that Spring Scaffolding never had any ladders at any job site, specifically not at this job site. Ms. Winecoff was the property manager at the time the sidewalk bridge scaffolding job was taking place. So she was at the premises when this work was going on, and she testified that she observed the workers accessing the sidewalk bridge with ladders. And I think it goes to the credibility of plaintiff, how he testified, and whether it's believable.

THE COURT: How long did this work take to perform?

MR. TAGLIAGAMBE: It wasn't a quick project. It was a fairly large scope. So the plaintiffs worked at that particular location for approximately one week, but it had been ongoing. A significant amount of the work had been completed as of the date of the accident, not all of it. But this had been going on for a while during the period of time that Ms. Winecoff had been acting as a property manager. When she testified, she was no longer actually employed by the company, but she had recall generally as to what was going on and what she observed.

So her testimony is very much focused on, was there work going on involving the erection of scaffolding on the sidewalk bridge, did she observe it, did she observe ladders. It's pretty straightforward. There's no surprises there. And it goes to the testimony that plaintiff gave that they're in this specific location, let alone other locations, and Spring Scaffolding never had any ladders. This is something that's very much in dispute. And Ms. Winecoff provides relevant testimony that goes to the issue of whether ladders were provided. That's one of the -- a basis for plaintiff seeking relief of Section 240 of New York's labor law.

THE COURT: And what is she going to say about her presence at the construction site in or about January 23, 2019? What is she going to say about that?

MR. TAGLIAGAMBE: Your Honor, I would have to double

check her testimony. I apologize for not having a specific response. She is not a witness to the accident and I'm not sure if she testified what recollection she had of that specific thing. But that's like asking, What were you doing four months ago when you reported to work? It was an event she did not witness, it happened to occur later in the work day, towards the end of the work day, and that's the best I can provide at this point in time.

THE COURT: So I'm going to need an offer of proof. I mean, obviously you will consult with Ms. Winecoff.

MR. TAGLIAGAMBE: Yes.

THE COURT: And the issue that I have in my mind right now is whether she's going to be able to testify that she was on the work site in sufficient proximity to January 23, 2019, such that it would be reasonable to draw an inference that if she saw ladders at the job site at that point the jury could infer that there were probably ladders at the job site on January 23, 2019. But until I hear from you an offer proof as to what she's going to say on that point, I can't rule.

MR. TAGLIAGAMBE: Understood, your Honor.

MR. JACONO: Thank you, your Honor.

THE COURT: I am going to talk about my jury procedures in a minute, but I wanted to know if there are other issues that the lawyers want to talk about before I go to jury selection.

MR. TAGLIAGAMBE: Your Honor, the only other issue that I would bring up is the timing of the case. And we understand we want to have everything ready, so if we can have a projected time for the plaintiff's case so that we can have all defense witnesses lined up and ready to go. We do have two doctors that are ready, willing, and able to testify, but one of them has surgeries scheduled and we want to be able to accommodate to whatever extent that we can.

THE COURT: All right. Plaintiff has listed four witnesses, those being plaintiff, the economic expert that I discussed a minute ago, and then two doctors. So I expect that we will have a jury picked before lunch, certainly by lunch on Monday. So the lawyers can assume that not only will we do openings on Monday, but we will also get into taking testimony on Monday.

So understanding that that's how Monday looks, let me ask plaintiff's counsel what he anticipates in terms of how long it will take to complete plaintiff's case.

MR. JACONO: I should be able to put the plaintiff on in the afternoon on the 31st. He should be completed with cross-examination, maybe some spill over--but that depends on the cross--on the 1st. I have confirmed two of the experts. I'm trying to get the third one for that day. If not, I may have to spill over until November 2 to do the third expert.

THE COURT: Okay. So it's possible that plaintiff's

case may especially over to Wednesday morning?

MR. JACONO: Yes, sir.

THE COURT: So you should be ready to go at some point on Wednesday morning.

MR. TAGLIAGAMBE: Yes, your Honor.

And I have --

THE COURT: Are you still going to call the five witnesses that you have listed?

MR. JACONO: I believe we've listed the foreman and two doctors.

THE COURT: And then Ms. Winecoff?

MR. TAGLIAGAMBE: And then Ms. Winecoff.

Ms. Winecoff, if she is permitted to testify, I would think would be a very short witness because she has limited knowledge. I could have my experts available for Thursday and I would anticipate that we would be able to rest with those experts Thursday afternoon.

THE COURT: And you also have Ms. Bruen who is going to testify about the video, right?

MR. TAGLIAGAMBE: Unless we stipulate to that. Sorry. That's the surveillance.

THE COURT: The video.

MR. TAGLIAGAMBE: I was referring to the video of the accident, which was a very short video.

MR. JACONO: I think we have stipulated to that.

MR. TAGLIAGAMBE: We've already spoken about trying to streamline any issues with regard to some of the proof that's in play.

So Ms. Bruen is the individual who actually took the video. Again, I think that would be a very short witness. And if she couldn't come in on Wednesday, it would be a very brief presentation on Thursday, and I would anticipate being able to wrap everything up. I would plan, barring anything unforeseeable, your Honor, of trying to have Mr. Ionascu, who is foreman in question, available for Wednesday. And depending on the ruling with respect to Ms. Winecoff, I'd like to try and get her on the stand that day as well, and then the two experts on Thursday.

THE COURT: And how long is the surveillance video?

MR. TAGLIAGAMBE: It's approximately --

MR. JACONO: Fifteen minutes.

MR. TAGLIAGAMBE: Yes. It's in the zone of 15 to 20 minutes.

THE COURT: Okay. So it seems from what you've told me that I could tell the jury that it is our best expectation that the trial will consume approximately a week.

MR. JACONO: Yes.

MR. TAGLIAGAMBE: Yes, your Honor.

THE COURT: Okay.

All right. If there's nothing else the lawyers want

to raise, let me talk to you about my jury procedures.

So what we're going to do is bring in 22 people. We will be selecting eight jurors and the process will be as follows. I will ask questions to the panel as a whole, general questions.

One question I had about what you fellows had submitted is -- I, of course, have standard questions I'm going to use for the most part. I do some questions that are specific to this case, and I will use some of your questions in that regard. The question that I wanted to speak with you about is one that goes to plaintiff's status as an undocumented worker. So the parties have asked me to use the following question in my *voir dire*:

The plaintiff was an undocumented worker. Does anyone harbor any ill will towards people who are not citizens of the United States? Is anyone unwilling to award monetary damages to a non-United States citizen?

So ordinarily I would not direct a jury's attention to someone's illegal status in the United States. I would not commonly do that. However, in the context of this case the plaintiff's status, the parties argue, has a bearing on damages. So do both sides want me to get into this? You've asked me to. Because I said ordinarily I would not, but in the context of this case, I will get into it if you want me to.

So, Mr. Jacono, do you want me to get into this?

MR. JACONO: I would appreciate that, your Honor.

THE COURT: All right. Then I will tell the jury that -- what I'm going to say is: The plaintiff does not have residency status in the United States and he was an undocumented worker. Does anyone harbor any ill will towards people who are not citizens of the United States? Is anyone unwilling to award monetary damages to someone who is not a United States citizen?

Okay?

MR. JACONO: Thank you, your Honor.

THE COURT: All right. So I will direct general questions to the 22 people on the panel, and then I have specific questions that go to the person's residency, employment, prior jury service, and so forth.

And then I will ask the lawyers to approach the bench and tell me whether they have any challenges for cause, and I will rule on the challenges for cause. And then I will take a short break to allow you to consider the jurors against whom you wish to exercise peremptory challenges. Each side here will have three peremptory challenges. The peremptory challenges will be submitted simultaneously. You will write on a sheet of paper the number and name of the individual against whom you are exercising a peremptory challenge. You will each submit those lists simultaneously. I will read the list to you and then we will agree upon the eight lowest number jurors who

have survived the process and they will make up the jury.

If there is duplication between the lists, if both of you have struck the same person, that will have no consequence other than the juror will have been struck by both sides.

Any questions about the process?

MR. TAGLIAGAMBE: Your Honor, the only question I have is are the jurors designated between the sitting ones and the alternates?

THE COURT: No. I mean, it will be six and two, but whoever is here at the end will deliberate. So just to use an example, if for some reason we lost a person during a trial, we would go forward with the seven and those seven would decide the case. If it turns out we don't lose anyone at the end, all eight will decide and deliberate the case.

MR. TAGLIAGAMBE: Thank you, your Honor.

THE COURT: In terms of scheduling, I'm going to ask you to be here at 9:30 on Monday so that if there's anything to discuss we can discuss it then. It is my expectation that a jury panel will be brought up here some time in the vicinity of 10:15, and then we will begin with the jury selection process. As I've said, I do believe that we will have a jury by lunchtime, we may even be able to open before lunchtime. That is my hope.

Should I assume at this point that settlement discussions are at an end and that the case is definitely going

to trial?

MR. JACONO: No. We are going to have a discussion after we're done here today, your Honor.

THE COURT: You're going to continue discussing?

MR. JACONO: Yes.

THE COURT: All right. Well, all I would ask you is keep in mind I'm going to have 22 people come here on Monday morning. So, please, if you're able to resolve the case, let us know as soon as possible so we don't make these people come down here for no reason; okay?

MR. JACONO: Appreciate it, your Honor.

THE COURT: Is there anything else the lawyers want to raise?

MR. JACONO: Just for the exhibits, are we going to be using the screens?

THE COURT: You're welcome to use the screens for exhibits.

MR. JACONO: Or we could just use paper as well?

THE COURT: Yes. Whatever you're most comfortable with.

MR. JACONO: Thank you.

THE COURT: Most lawyers use the screens, but you don't have to. It's whatever you're most comfortable with.

MR. JACONO: Thank you, your Honor.

THE COURT: All right. If there's nothing else, we're

adjourned. I wish you a good evening.

MR. TAGLIAGAMBE: You too, your Honor.

MR. JACONO: Thank you.

(Adjourned)